# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

CANONSBURG GENERAL HOSPITAL,

Plaintiff,

v.

KATHLEEN SEBELIUS,
*Secretary, U.S. Department of Health and Human Services*

Defendant.

Civil Action No. 09-2385 (BAH)

Judge Beryl A. Howell

## MEMORANDUM OPINION

The plaintiff, Canonsburg General Hospital, brings this challenge, under the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 553 *et seq*., against the Secretary of the U.S. Department of Health and Human Services ("the Secretary"), alleging that the Secretary's regulation used to calculate reimbursement for services under Medicare is arbitrary and capricious. Pending before the Court are the defendant's Motion For Summary Judgment, ECF No. 28, and the plaintiff's Cross-Motion for Summary Judgment, ECF No. 29. As explained below, the defendant's motion is granted and the plaintiff's cross-motion is denied because the plaintiff is precluded from raising this legal challenge after the same issue has already been fully adjudicated between the same parties in the District Court for the Western District of Pennsylvania.

## I.      BACKGROUND

### A.      Statutory Scheme

Medicare is a federal program that pays for health care services furnished to eligible beneficiaries—generally individuals over 65 and individuals with disabilities. *See* 42 U.S.C. §

1395c.  The Centers for Medicare and Medicaid Services ("CMS"), formerly known as the

Health Care Financing Administration,[1] is the component of the Department of Health and

Human Services ("HHS") that administers the Medicare program.  *See St. Elizabeth's Med. Ctr.*

*of Bos., Inc. v. Thompson,* 396 F.3d 1228, 1230 (D.C. Cir. 2005).  The CMS reimburses

healthcare providers[2] for, *inter alia*, "the reasonable cost" of services provided to Medicare

beneficiaries.  *See* 42 U.S.C. § 1395f(b)(1).

"Congress authorized the Secretary of Health and Human Services to issue regulations

defining reimbursable costs and otherwise giving content to the broad outlines of the Medicare

statute."  *Thomas Jefferson Univ. v. Shalala*, 512 U.S. 504, 506–07 (1994) (citing 42 U.S.C. §

1395x(v)(1)(A)).  Pursuant to this authority, the Secretary has "discretion to determine . . . the

'reasonable cost' of services."  *Id.* at 507.  "Reasonable cost" is defined as "the cost actually

incurred, excluding therefrom any part of the incurred cost found to be unnecessary in the

efficient delivery of needed health services, and shall be determined in accordance with

regulations" promulgated by HHS.  42 U.S.C. § 1395x(v)(1)(A).

Title XVIII of the Social Security Act established the Medicare program to provide

health insurance for the elderly and disabled individuals.  *See* 42 U.S.C. §§ 1395 *et seq.*; *see also*

*Baptist Mem'l Hosp. v. Sebelius*, 768 F. Supp. 2d 295, 296 (D.D.C. 2011); *Milton Hosp.*

*Transitional Care Unit v. Thompson*, 377 F. Supp. 2d 17, 19 (D.D.C. 2005).  Relevant to the

instant case is Part A of the Medicare program, which authorizes payments for institutional care

provided by hospitals and free-standing skilled nursing facilities ("SNFs").  *See* 42 U.S.C. §§

---

[1] The agency was renamed the CMS in 2001.  *See* Def.'s Mem. Supp. Mot. Summ. J. ("Def.'s Mem.") at 3 n.1, ECF
No. 28.  For the purpose of clarity, the Court will refer to the agency throughout this Opinion as the CMS.
[2] "Provider of services" is defined as "a hospital, critical access hospital, skilled nursing facility, comprehensive
outpatient rehabilitation facility, home health care agency, hospice program, or, for purposes of [other provisions] of
this title, a fund."  42 U.S.C. § 1395x(u).

1395c–1395i(5).  "Provider[s] of services," such as SNFs, furnish Part A services after having

entered into a "provider agreement" with the Secretary.  *See id.* §§ 1395x(u), 1395cc.

SNFs submit claims, which are also known as "cost reports," for reimbursement to

private "Medicare administrative contractors," who serve as fiscal intermediaries to process

claims and reimburse providers on behalf of Medicare.  *See* 42 U.S.C. §§ 1395kk–1(a)(4).  If the

SNF disagrees with a fiscal intermediary's reimbursement decision, the provider may appeal the

decision to the Provider Reimbursement Review Board ("PRRB"), a five-member body

appointed by the Secretary.  *See id.* § 1395oo.  At her discretion, the Secretary may reverse,

affirm, or modify any PRRB decision.  *Id.* § 1395oo(f); *see also* 42 C.F.R.

§ 405.1875.  The Secretary's decision or, if the Secretary takes no action, the PRRB's decision,

constitutes a final agency action, and a provider has the right to challenge such a decision in

federal district court within sixty days of issuance.  *See* 42 U.S.C. § 1395oo(f).

"Seeking to encourage Medicare-certified providers to operate efficiently, Congress has

instructed the Secretary . . . to cap payments under these programs at what [s]he determines to be

reasonable cost limits ('RCLs') and apply statutory norms in the determination."  *St. Elizabeth's

Med. Ctr. of Boston, Inc.*, 396 F.3d at 1230 (citing 42 U.S.C. §§ 1395f(b), 1395x(v), 1395yy).

Accordingly, the Secretary promulgated regulations pertaining to RCLs and also outlined certain

exemptions and exceptions where these cost limits may be adjusted.  *See* 39 Fed. Reg. 20164

(June 6, 1974); 39 Fed. Reg. 10260 (Mar. 19, 1974); *see also* 42 C.F.R. § 413.30.  "Exemptions

from [RCLs] imposed under [42 C.F.R. § 413.30] may be granted to a new SNF," 42 C.F.R. §

413.30(d), and a provider who receives such an exemption is "not affected at all by the cost

limits and is reimbursed under the standard rules."  44 Fed. Reg. 31,802 (June 1, 1979); *see also*

64 Fed. Reg. 42610, 42611 (Aug. 5, 1999); 63 Fed. Reg. 42797 (Aug. 11, 1998).

"An exception differs from an exemption," 44 Fed. Reg. 31,802 (1979), since an exception provides that RCLs may be adjusted upward under specific, enumerated circumstances "to the extent that the costs are reasonable, attributable to the circumstances specified, separately identified by the SNF . . ., and verified by the intermediary." 42 C.F.R. § 413.30(e). Relevant to the instant case, an "atypical service" exception applies where (1) "the actual cost of services furnished . . . exceeds the applicable limit because the services are atypical in nature and scope, compared to the services generally furnished by SNFs . . . similarly classified;" and (2) "[a]typical services are furnished because of the special needs of the patients treated and are necessary in the efficient delivery of needed health care." 42 C.F.R. § 413.30(e)(1).

When determining what RCL is to be applied, SNFs are categorized into four groups based upon two primary criteria: (1) location in an urban or rural area, and (2) "freestanding" or "hospital-based." *See generally* 42 U.S.C. § 1395yy(a). Each group has its own RCL. *Id.* Initially, the RCLs were set at 115 percent of the mean per diem costs for routine services at SNFs within each peer group. *See* 44 Fed. Reg. 51542, 51545 (Aug. 31, 1979). The RCLs were later lowered to their present level of 112 percent of mean per diem cost. *See* 45 Fed. Reg. 58699, 58700 (Sept. 4, 1980). Under this arrangement, RCLs for hospital-based SNFs were found to be significantly higher than those for freestanding SNFs, leading Congress to include in the Deficit Reduction Act of 1984 ("DEFRA") a direction to the Secretary to reduce the RCL for hospital-based SNFs. 42 U.S.C. §§ 1395yy(a)(3)-(4). According to several studies cited in the legislative history of the DEFRA, half of the higher cost difference for hospital based SNFs compared to lower cost, freestanding SNFs, was attributable to intensity of care or mix of patient cases and the other half was likely caused by inefficiency.[3] *St. Francis Health Care Ctr. v.*

[3] The plaintiff challenges the defendant's reference to cost studies regarding hospital-based SNF inefficiencies that were published subsequent to the passage of DEFRA and that the Secretary relied upon in formulating PRM §

*Shalala*, ("*St. Francis*") 205 F.3d 937, 940 n.3 (6th Cir. 2000) (citing Pub. L. No. 98-369, §

2319(b), 98 Stat. 494, 1082 (later codified at 42 U.S.C. § 1395yy(a))).

DEFRA responded to the higher cost of hospital-based SNFs attributable to inefficiency

by lowering the hospital-based SNF RCLs from 112 percent of the peer group mean to half the

cost difference between the 112 percent level for hospital-based SNFs and freestanding SNFs.

*St. Francis*, 205 F.3d at 940.  In other words, the hospital-based SNF RCL was capped at the

amount representing the sum of the 112 percent level RCL for freestanding SNFs plus half the

difference between the 112 percent level RCL for hospital-based SNFs and freestanding SNFs.[4]

*Id.*; *see also* 42 U.S.C. §§ 1395yy(a)(3)-(4).  Notwithstanding the DEFRA required reduction in

hospital-based SNF-RCLS, "[i]t is undisputed that for 15 years the Secretary interpreted the

regulation as permitting a provider to recover all reasonable costs that exceeded the limits if it

was demonstrated that it met the exception requirements."  *See* Administrative Record ("AR") at

41 (PRRB Order), ECF No. 9.

In 1994, the Secretary issued Health Care Financing Administration Transmittal No. 378,

which added a new section, PRM § 2534.5, to the Medicare Provider Reimbursement Manual

("PRM").  *See* PRM § 2534.5; *see also* Def.'s Mem. Supp. Mot. Summ. J. ("Def.'s Mem."), Ex.

1, ECF No. 28; Pl.'s Mem. Opp'n Def.'s Mot. Summ. J. ("Pl.'s Mem."), Ex. A, ECF No. 30-1.

PRM § 2534.5 states that when "determining reasonable cost, the provider's per diem costs in

---

2534.5.  *See* Pl.'s Mem. at 10–11 & n.3 ("Moreover, the studies themselves are not part of the Administrative
Record or the record before the PRRB and should, thus, not be considered here.").  Courts have, however,
recognized that Congress did have several studies at its disposal when it passed the DEFRA.  *See St. Francis*, 205
F.3d at 940 ("Congress, aware of results from several studies of the higher HB-SNF costs, enacted the [DEFRA].");
*San Joaquin Cmty. Hosp. v. Thompson*, No. 01-5733, 2002 WL 34596496, at *16 (noting a "preview" of the 1985
HCFA Report to Congress "was requested by Congress prior to passage of DEFRA").

[4] The court in *St. Francis* offered the following example:  Assume the original 112 percent RCL for hospital-based
SNFs and freestanding SNFs in urban areas were $120 and $80 respectively.  After the passage of DEFRA, the RCL
of freestanding SNFs would remain $80 while the RCL for hospital-based SNFs would be calculated as follows: $80
(the 112 percent level RCL of freestanding SNFs in urban areas) + (.50 (one-half) X (120 (112 percent level RCL of
hospital-based SNF in urban area) – 80 (112 percent level RCL of freestanding SNFs in urban areas))) = $80 + (.5 X
(40)) = $100.  Accordingly, before DEFRA, hospital-based SNFs would be receiving $120, but now will only
receive $100.  *St. Francis*, 205 F.3d at 945 n.9.

excess of the cost limit are . . . compared to per diem costs of a peer group of similarly classified providers." PRM § 2534.5; Def.'s Mem., Ex. 1, at 9; Pl.'s Mem, Ex. A, at 9. For hospital-based SNFs, the qualifying amount for reimbursement under an exception is measured from 112 percent of the SNF's peer group mean per diem cost, not the SNF's peer group RCL. PRM § 2534.5, Def.'s Mem., Ex. 1, at 10; Pl.'s Mem, Ex. A, at 10. Consequently, hospital-based SNFs are precluded from being reimbursed for costs incurred through provision of atypical services that are in excess of the RCL but below the 112 percent peer group mean per diem threshold.

### B. The Plaintiff

Canonsburg General Hospital ("Canonsburg" or "the plaintiff") is a hospital located in Pennsylvania that participated in the Medicare program during all years relevant to the instant case. *See* Compl. ¶ 6, ECF No. 1; Answer ¶ 6, ECF No. 10. Canonsburg also owned and operated a SNF which participated in the Medicare program. AR 5, 38, 46; Compl. ¶¶ 6, 32; Answer ¶¶ 6, 32. Canonsburg's SNF was hospital-based, and reimbursed on a reasonable cost basis, subject to RCLs promulgated by CMS. AR 5, 38, 46; Compl. ¶ 32; Answer ¶ 32. Canonsburg's SNF received an exemption from RCLs as a new provider for the three fiscal years ending on June 30th in 1984, 1985, and 1986. AR 5, 38, 46; Compl. ¶ 33; Answer ¶ 33. For every year thereafter, including through fiscal year 1996, Canonsburg exceeded the hospital-based SNF RCL and sought RCL exceptions for each of these years. AR 5, 38, 46; Compl. ¶ 34; Answer ¶ 34.

### C. *Canonsburg I*

Following the application of PRM § 2534.5 to cost reports the plaintiff filed for the five fiscal years ending June 30, 1987 through June 30, 1990 and June 30, 1993, the plaintiff sued the defendant in the District Court for the Western District of Pennsylvania "challeng[ing] the methodology used by the Secretary in calculating the amount of its reimbursement for atypical

services" for the relevant fiscal years. *See Canonsburg Gen. Hosp. v. Thompson*, No. 00-284, 2001 WL 36339671, at *1 (W.D. Pa. Feb. 28, 2001) (*"Canonsburg I"*). Specifically, Canonsburg argued that PRM § 2534.5 improperly interpreted the applicable statute and regulation when determining atypical cost exceptions from hospital-based SNF RCLs. *See id.*

The plaintiff asserted three arguments in support of its position in *Canonsburg I*: (1) PRM § 2534.5 conflicts with the applicable cost limit statute, 42 U.S.C. § 1395yy(c), and regulation, 42 C.F.R. § 413.30(f); (2) PRM § 2534.5 is a substantive rule which was not passed pursuant to the APA's notice and comment requirements, 5 U.S.C. § 553; and (3) the exception methodology outlined in PRM § 2534.5 is invalid because it is arbitrary, capricious and an abuse of discretion. *Id.* at *3; Def.'s Mem. Ex. 4, at 11, 17, 21, ECF No. 28. The court in *Canonsburg I* addressed each argument relying heavily on the Sixth Circuit's reasoning in *St. Francis*.

First, the *Canonsburg I* court determined that because the cost limits in the Medicare statute are phrased in permissive, not mandatory, language, the "Secretary's interpretation of the regulation and statute in PRM 2534.5 was reasonable, not arbitrary." *Canonsburg I*, 2001 WL 36339671, at *4. Second, the *Canonsburg I* court rejected the plaintiff's argument that PRM § 2534.5 was procedurally invalid because it was not promulgated pursuant to the APA's notice and comment requirements. *Id.* The court noted that PRM rules have been widely held to be "interpretive rules" and exempt from notice and comment rulemaking and, further, that PRM § 2534.5 on its face does not "effect new substantive reimbursement standards inconsistent with prior regulations-the central characteristic of a substantive rule." *Id.* (quoting *St. Francis*, 205 F.3d at 947). Finally, the *Canonsburg I* court rejected the plaintiff's argument that the regulation discriminates between free-standing and hospital-based SNFs because, "once [hospital-based SNFs are] discounted for their unreasonable costs as determined by Congress . . . [both types of

SNFs] are treated relatively the same." *Id.* (quoting *St. Francis*, 205 F.3d at 946).  The

*Canonsburg I* court decided on cross-motions for summary judgment in favor of the defendant

and against the plaintiff.  *See Canonsburg I*, 2001 WL 36339671, at *5.  The plaintiff took no

appeal from this decision.

### D.      The Instant Case (*Canonsburg II*)

In September 1998, several years before the issuance of the decision in *Canonsburg I*, the

plaintiff again filed a filed a cost report with its Medicare fiscal intermediary ("the

Intermediary") claiming certain costs incurred by its SNF were atypical for Fiscal Year 1996.

Pl.'s Mem. at 1.  Under protest, the plaintiff disallowed $470,528 worth of atypical services costs

which exceeded its RCL but fell short of the 112 percent peer group mean per diem threshold.

AR 6, 39, 46, 1040.  The Intermediary granted an atypical services exception to the plaintiff, but

calculated the amount of the exception pursuant to PRM § 2534.5 and denied the entire self-

disallowed amount in the Notice of Program Reimbursement (NPR) issued May 4, 1998.  AR

46-47, 697.  The Intermediary also calculated certain indirect costs as falling below the 112

percent cutoff, resulting in an additional disallowance amount of $46,765 from the atypical

services exception request.  AR 6, 39, 46, 688.  The plaintiff appealed to the PRRB.  AR 38-39.

In 2009, the PRRB found that the Intermediary should have allowed for reimbursement

of the plaintiff's costs in excess of the RCL and that PRM § 2534.5 was invalid on substantive

and procedural grounds.  AR 41-44.  Later that year, the Acting Deputy Administrator of CMS

("Administrator") reversed the PRRB's decision, finding that all hospital-based SNF costs

between the RCL and the 112 percent threshold are unreasonable costs.  AR 17-18.  The

Administrator found that PRM § 2534.5 was consistent with the statute and regulations and that

the provision itself was a "reasonable and appropriate" application of reasonable cost

requirements.  *Id.* at 17.  The Administrator also found that PRM § 2534.5 was not a change in

CMS policy, meaning the provision did not need to be issued through notice and comment rulemaking before promulgation. *Id*. at 15-16. The plaintiff timely filed the instant suit challenging the Administrator's decision under 42 U.S.C. § 1395oo(f), raising what are effectively the identical arguments to those raised in *Canonsburg I*. *See* Compl. ¶ 48; AR 2-16, Pl.'s Mem. *generally*. The parties have both moved for summary judgment.

## II. LEGAL STANDARD

### A. Summary Judgment

Granting a motion for summary judgment is appropriate if the movant carries the burden of showing "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law," based upon the pleadings, depositions, and affidavits, and other factual materials in the record. FED. R. CIV. P. 56(a), (c); *Ali v. Tolbert*, 636 F.3d 622, 628 (D.C. Cir. 2011); *Tao v. Freeh*, 27 F.3d 635, 638 (D.C. Cir. 1994). The court is only required to consider the materials explicitly cited by the parties, but may, on its own accord, consider "other materials in the record." FED. R. CIV. P. 56(c)(3).

In this case, the Court is presented with cross motions for summary judgment for purposes of reviewing the plaintiff's legal challenge to an HHS regulation and its application to the plaintiff. "[W]hen an agency action is challenged[] . . . [t]he entire case on review is a question of law, and only a question of law." *Marshall Cnty. Healthcare Auth. v. Shalala*, 988 F.2d 1221, 1226 (D.C. Cir. 1993). This Court need not and ought not engage in lengthy fact finding, since "[g]enerally speaking, district courts reviewing agency action under the APA's arbitrary and capricious standard do not resolve factual issues, but operate instead as appellate courts resolving legal questions." *James Madison Ltd. by Hecht v. Ludwig*, 82 F.3d 1085, 1096 (D.C. Cir. 1996); *see also Sierra Club v. Mainella*, 459 F. Supp. 2d 76, 90 (D.D.C. 2006) ("Under the APA, it is the role of the agency to resolve factual issues to arrive at a decision that

is supported by the administrative record, whereas the function of the district court is to determine whether or not as a matter of law the evidence in the administrative record permitted the agency to make the decision it did.") (quotation marks and citation omitted); *McDonough v. Mabus*, 907 F. Supp. 2d 33, 42 (D.D.C. 2012); *Wilson v. McHugh*, 842 F. Supp. 2d 310, 315 (D.D.C. 2012); *Caez v. United States*, 815 F. Supp. 2d 184, 188 (D.D.C. 2011). Neither party has raised a disputed material fact as to the legal issue on which this case is resolved.[5] *See* Compl. ¶¶ 51–54 ("Claim for Relief"); s*ee* Pl.'s Mem. *generally*; Def.'s Mem., *generally*.

## B. Issue Preclusion

"The preclusive effect of a judgment is defined by claim preclusion and issue preclusion, which are collectively referred to as 'res judicata.'" *Taylor v. Sturgell*, 553 U.S. 880, 892 (2008). Claim preclusion "forecloses 'successive litigation of the very same claim, whether or not relitigation of the claim raises the same issues as the earlier suit.'" *Id.* (quoting *New Hampshire v. Maine*, 532 U.S. 742, 748 (2001)). In contrast, issue preclusion, which was "once known as 'collateral estoppel' and 'direct estoppel,'" bars "successive litigation of an issue of fact or law actually litigated and resolved in a valid court determination essential to the prior judgment, even if the issue recurs in the context of a different claim." *Id.* at 892 and n.5 (internal quotations and citations omitted); *see also U.S. Postal Serv. v. Am. Postal Workers Union*, 553 F.3d 686, 696 (D.C. Cir. 2009) ("Under collateral estoppel, once a court has decided an issue of fact or law necessary to its judgment, that decision may preclude relitigation of the issue in a suit on a different cause of action involving a party to the first case.") (internal quotation marks and

---

[5] The plaintiff claims that the principal amount in controversy is $526,293 while the Secretary estimates that it is $191,541. *See* Compl. ¶¶37-40; Def's Mem. at 13, n.9; Def.'s Opp'n to Pl.'s Mot. Summ. J. & Reply to Pl.'s Opp'n to Def.'s Mot. Summ. J. ("Def.'s Reply") at 2, n.1, ECF No. 32; Pl.'s Mem. at 13, n.4. The defendant asserts that "if this Court finds that the Secretary's final decision was erroneous, it should remand for a precise calculation of that reimbursement impact." Def.'s Mem. at 13 n.9. The plaintiff counters that the Court should award the full amount it seeks based upon the fact that the "Intermediary stipulated to this amount." Pl.'s Mem., at 13 n.4. This dispute over the amount that should be awarded in the event the plaintiff prevails on its challenge to the regulation is not material to the legal issue of issue preclusion on which this case is resolved.

citation omitted).  The Supreme Court has explained that these preclusion doctrines serve the important functions to "protect against 'the expense and vexation attending multiple lawsuits, conserv[e] judicial resources, and foste[r] reliance on judicial action by minimizing the possibility of inconsistent decisions.'"  *Taylor*, 553 U.S. at 892 (quoting *Montana v. United States*, 440 U.S. 147, 153-154 (1979)) (alteration in original); *see also Yamaha Corp. of Am. v. United States*, 961 F.2d 245, 254 (D.C. Cir. 1992) ("The objective of the doctrine of issue preclusion . . . is judicial finality; it fulfills 'the purpose for which civil courts have been established, the conclusive resolution of disputes within their jurisdiction.'") (quoting *Kremer v. Chemical Constr. Corp.*, 456 U.S. 461, 467 n.6 (1982)).

Three elements must be satisfied for a final judgment to preclude litigation of an issue in a subsequent case: "[1], the same issue now being raised must have been contested by the parties and submitted for judicial determination in the prior case[; 2] the issue must have been actually and necessarily determined by a court of competent jurisdiction in that prior case[; and] [3] preclusion in the second case must not work a basic unfairness to the party bound by the first determination."  *Martin v. Dep't of Justice*, 488 F.3d 446, 454 (D.C. Cir. 2007) (quoting *Yamaha*, 961 F.2d at 254 (D.C. Cir. 1992)) (alterations in original).  "[O]nce a court has decided an issue of fact or law necessary to its judgment, that decision may preclude relitigation of the issue in a suit on a different cause of action involving a party to the first case."  *McLaughlin v. Bradlee*, 803 F.2d 1197, 1201 (D.C. Cir. 1986) (quoting *Allen v. McCurry*, 449 U.S. 90, 94 (1980)).

The overriding goal of the issue preclusion doctrine is to "avert needless relitigation and disturbance of repose, without inadvertently inducing extra litigation or unfairly sacrificing a person's day in court."  *Otherson v. U.S. Dep't of Justice*, 711 F.2d 267, 273 (D.C. Cir. 1983).

When the first two prerequisites for application of the issue preclusion doctrine are met, the plaintiff "must be permitted to demonstrate, if he can, that he did not have a fair opportunity procedurally, substantively, and evidentially to pursue his claim the first time." *Blonder-Tongue Labs., Inc. v. Univ. of Ill. Found.*, 402 U.S. 313, 333 (1971) (internal quotation marks omitted). As the Supreme Court explained, "a party who has had one fair and full opportunity to prove a claim and has failed in that effort, should not be permitted to go to trial on the merits of that claim a second time. Both orderliness and reasonable time saving in judicial administration require that this be so unless some overriding consideration of fairness to a litigant dictates a different result in the circumstances of a particular case." *Id.* at 324-25.

Notably, "[a] court conducting an issue preclusion analysis does not review the merits of the determinations in the earlier litigation." *Consol. Edison Co. of N.Y. v. Bodman*, 449 F.3d 1254, 1257 (D.C. Cir. 2006); *see also Nat'l Post Office Mail Handlers, Watchmen, Messengers, and Grp. Leaders Div. of Laborers' Int'l Union of N. Am. v. Am. Postal Workers Union*, 907 F.2d 190, 194 (D.C. Cir. 1990) ("The doctrine of issue preclusion counsels us against reaching the merits in this case, however, regardless of whether we would reject or accept our sister circuit's position."); *Yamaha Corp. of Am. v. United States*, 745 F. Supp. 734, 738 (D.D.C. 1990) (noting the D.C. Circuit's instruction "that collateral estoppel prevents a court from ever reaching the merits").

## III.    DISCUSSION

The defendant argues that the plaintiff's claims are precluded because of the decision in *Canonsburg I. See* Def.'s Mem. at 16 ("Plaintiff's action is barred because it is impermissibly seeking to re-litigate the same legal issues and arguments which it litigated" in *Canonsburg I*). The plaintiff does not assert any argument regarding the first two elements of issue preclusion

and the Court finds that they are met in the instant case. *See* Pl.'s Mem. at 2–3 (raising

arguments against preclusion not including challenges to prongs one or two of the *Yamaha* test).

Indeed, at first blush, this case is a classic example where issue preclusion is appropriate: the

same parties to *Canonsburg I* are parties to this action, namely: Canonsburg General Hospital

and the Secretary, *compare Canonsburg I*, 2001 WL 36339671, at *1, *with* Compl. at 1; the same

ultimate issue is in dispute, namely: the validity of PRM § 2534.5, *compare Canonsburg I*, 2001

WL 36339671, at *1 *with* Compl. ¶ 52(e); and the issue at stake was "necessarily determined by

a court of competent jurisdiction," in *Canonsburg I*, *see Canonsburg I*, 2001 WL 36339671, at

*5 ("PRM § 2534.5 is not an arbitrary or capricious interpretation of the statute and regulations

governing reimbursement to Medicare providers.").

Instead, the plaintiff raises four arguments against issue preclusion, all of which appear to

be directed to the third prong of the *Yamaha* test: whether issue preclusion would "work a basic

unfairness" on the plaintiff. Thus, the Court first considers whether applying claim preclusion

here would work the type of unfairness necessary to except a case otherwise precluded from

decision, and then turns to each of the plaintiff's arguments.

### A. Applying Issue Preclusion Is Not Unfair To The Plaintiff

In evaluating the potential unfairness to the plaintiff in precluding an APA challenge to

an agency rule, the Court is cognizant that "[a]llowing one circuit's statutory interpretation to

foreclose APA review of the question in another circuit would squelch the circuit disagreements

that can lead to Supreme Court review." *Holland v. Nat'l Mining Ass'n*, 309 F.3d 808, 815 (D.C.

Cir. 2002). Yet, the preclusion doctrine trumps this concern and permits circuit disagreement to

be considered when "differing interpretations are developed in different cases, not in the same

dispute." *Id.*

*Holland* is instructive on this point. In that case, the D.C. Circuit declined to apply issue preclusion against the plaintiff in a case involving an identical legal challenge under the APA to the same agency rule at issue in an earlier Eleventh Circuit case, brought by different plaintiffs. *See Holland*, 309 F.3d at 814. The court allowed the case to proceed to the merits, because the plaintiffs were different and did "not share the same incentives" as the original plaintiffs in the Eleventh Circuit. *Id.* The D.C. Circuit observed that its ruling would not disturb the Eleventh Circuit's ruling as to the original plaintiffs, but rather would only apply to those not a party to the original suit. *Id.* The court discounted the agency's contention that it would be "potentially subject … to two conflicting orders," explaining that the agency could apply the rule "according to the two different interpretations . . . depending on whether the particular [company subject to the rule] was or was not party to the Eleventh Circuit suit." *Id.* In short, the possibility of regulated entities being subject to different interpretations of the same rule due to different court interpretations—and whatever unfairness this possibility presented—was not a relevant factor in considering whether claim preclusion was appropriate. *See also United States v. 5 Unlabeled Boxes*, 572 F.3d 169, 175-176 (3d Cir. 2009) (applying res judicata to bar plaintiff's challenge to agency rule and rejecting argument "that application of res judicata on issues of statutory interpretation would improperly 'squelch[] the circuit disagreements that can lead to Supreme Court review,' because "this concern—if assumed to have some weight—would be relevant only where the 'differing [statutory] interpretations are developed in different cases, not in the same dispute' and where there is not mutuality of parties.") (citing *Holland*, 309 F.3d at 815). The focus instead is on whether, as here, the plaintiff has already had its day in court on the identical issue and, having lost, is trying to get the proverbial "second bite at the apple."

In examining "unfairness" for the purposes of issue preclusion, the D.C. Circuit has been primarily concerned with whether "the losing party clearly lacked any incentive to litigate the point in the first trial, but the stakes of the second trial are of a vastly greater magnitude." *Yamaha*, 961 F.2d at 254.[6] For example, in *Otherson v. Department of Justice*, the court was asked to determine whether issue preclusion was appropriate where the plaintiff had been found guilty of two federal misdemeanors at a bench trial and he sought to contest the allegations underlying those charges in a later Merit Systems Protection Board hearing. 961 F.2d at 269-71. The plaintiff in *Otherson* argued that it was unfair to apply preclusion in his case because "the bargain with the prosecution" leading to misdemeanor charges instead of felonies "created an actual disincentive to litigate these particular issues." *Id.* at 276. The court found there was "no great unfairness in holding [the plaintiff] to the determinations from his prior criminal conviction." *Id.* at 278.

As part of its reasoning, the court noted that "when preclusion is sought by a former adversary, and the other requirements for preclusion are met, courts should refuse to give the first judgment preclusive effect on grounds that the party lacked adequate incentive to litigate in the first proceeding only upon a 'compelling showing of unfairness.'" *Id.* at 277 (quoting RESTATEMENT (SECOND) OF JUDGMENTS § 28 comment j). "Even the fact that the first determination was 'patently erroneous' is not alone sufficient.'" *Id.*; *see also Venetian Casino Resort, LLC v. NLRB*, 484 F.3d 601, 610 (D.C. Cir. 2007) (finding no unfairness where the court could "discern no difference between the incentives that the [plaintiff] may have had in its Ninth Circuit litigation and its incentives here. The stakes in its attempt before that court were no less than they are now."); *Beverly Health & Rehab. Servs., Inc. v. NLRB*, 317 F.3d 316, 323 (D.C.

---

[6] The D.C. Circuit has also been concerned with whether the "prior proceedings were seriously defective." *Martin*, 488 F.3d at 455 (citing *Blonder-Tongue Labs.*, 402 U.S. at 333). No such allegation has been raised here regarding *Canonsburg I*, and, consequently, this concern is inapplicable to the present analysis.

Cir. 2003) (finding no unfairness where the plaintiff "had every incentive to—and did—litigate the issue before the [previous court]").  Indeed, the Supreme Court recently confirmed the finality of a court's judgment even in the face of error, stating: "A court's power to decide a case is independent of whether its decision is correct, which is why even an erroneous judgment is entitled to res judicata effect."  *City of Arlington v. FCC*, 133 S. Ct. 1863, 1869 (2013).

Thus, neither *Canonsburg I* having possibly been wrongly decided nor the plaintiff being subject to a different and more costly interpretation of the challenged rule than similarly situated regulated entities, constitutes the type of unfairness warranting avoidance of claim preclusion. On the contrary, given the undisputed fact that the amount in controversy in *Canonsburg I* was almost double the amount of relief sought in this case, *see* Def.'s Reply at 2, n.1, the plaintiff certainly had no less, and possibly more, incentive to litigate that prior case fully.  Accordingly, the plaintiff has not shown that the application of issue preclusion in this case would work the kind of compelling unfairness warranting avoidance of the doctrine.  Nevertheless, the plaintiff has posited four arguments as to why issue preclusion is unfair in this case.  As explained below, none of these arguments is persuasive.

### B.    Plaintiff's First Argument Regarding A Change In Legal Landscape

The plaintiff first argues that applying issue preclusion to its claim would work be unfair because "the legal context has changed significantly in the last 10 years since the 2001" *Canonsburg I* decision.  Pl.'s Mem. at 18.  This argument centers on the Third Circuit's purported adoption in *SBC, Inc. v. FCC* , 414 F.3d 486, 497–98 (3d Cir. 2005), of a line of cases from this Circuit that originated with *Paralyzed Veterans of America v. D.C. Arena L.P.*, 117 F.3d 579 (D.C. Cir. 1997) ("*Paralyzed Veterans*").  *Paralyzed Veterans* holds that if a government agency "make[s] a fundamental change in its interpretation of a substantive regulation," the agency must subject that change to the notice-and-comment procedure laid out in

the APA.  *Id.* at 586; *see also* 5 U.S.C. § 553(b).  The plaintiff argues that because the Third

Circuit adopted *Paralyzed Veterans* after *Canonsburg I* was decided, and because two other

district court decisions in this Circuit concluded that the disputed Medicare regulation was

procedurally defective under *Paralyzed Veterans*, the landscape is "materially different than . . .

it was in 2001."  Pl.'s Mem. at 19–20.[7]  The plaintiff's argument is unavailing.

To constitute a sufficient shift in the legal landscape to make application of issue

preclusion unfair there must be a significant change in controlling law.  *See Apotex, Inc. v. FDA*,

393 F.3d 210, 218 (D.C. Cir. 2004) ("[I]n a small set of cases, a change in controlling legal

principles may allow a party to relitigate a claim that would otherwise be barred by *res

judicata*."); *Hardison v. Alexander*, 655 F.2d 1281, 1288 (D.C. Cir. 1981) (noting that only "on

rare occasions [have] the courts . . . been willing to override the bar of res judicata for reasons of

compelling public policy").  The plaintiff has not demonstrated such a change in controlling law

for three reasons.  First, the plaintiff highlights *SBC, Inc. v. FCC* as the significant case that

brought about a change in the law, but whether the Third Circuit "expressly adopted the

*Paralyzed Veterans* rationale," Pl.'s Mem. at 19, and, further, whether its treatment of the D.C.

Circuit case represented a substantial change or even a minor shift in Third Circuit controlling

law, is not so clear-cut.[8]  As the defendant points out, merely by citing *Paralyzed Veterans* in

---

[7] Even were this Court to reach the merits in this case, it is far from a foregone conclusion that the lead of the two other judges on this Court to apply *Paralyzed Veterans* should be followed and summary judgment granted to the plaintiff.  In the wake of *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502 (2009), the extent to which *Paralyzed Veterans* remains good law is decidedly unclear.  556 U.S. at 514 (holding there is no support in the APA for heightened scrutiny of agency action when "an agency reverses course"); *see also* Brian J. Shearer, *Outfoxing Alaska Hunters: How Arbitrary and Capricious Review of Changing Regulatory Interpretations Can More Efficiently Police Agency Discretion*, 62 AM. U. L. REV. 167, 185–88 (2012) (arguing that *Fox Television Stations* overruled *Paralyzed Veterans* and its progeny, particularly *Alaska Prof'l Hunters Ass'n v. FAA*, 177 F.3d 1030 (D.C. Cir. 1999)).  In any event, the Court need not address this issue since this case is resolved by application of issue preclusion without reaching a decision on the merits.  *See Bodman*, 449 F.3d at 1257; *Am. Postal Workers Union*, 907 F.2d at 194.

[8] The plaintiff's view that the Third Circuit "expressly adopted the *Paralyzed Veterans* rationale," Pl.'s Mem. at 19, is not uniformly held.  For instance, the Eleventh Circuit, in a survey of courts' views regarding the doctrine, noted that the Third Circuit had not adopted *Paralyzed Veterans*.  *See Warshauser v. Solis*, 577 F.3d 1330, 1338 (11th Cir.

*SBC, Inc. v. FCC* does not mean that the Third Circuit "understood … its decision to be a new holding or to override prior precedent." Def.'s Reply. at 10. To the contrary, the Third Circuit did not suggest that the ruling in *SBC, Inc. v. FCC* was breaking any new ground.

Second, it is significant that the Third Circuit concluded in *SBC, Inc. v. FCC* that the "APA's notice and comment requirements do not apply to the challenged agency action at issue since that action was 'at most, interpretative' and 'simply clarified, and explained, an existing rule.'" 414 F.3d at 501. This is consistent with *Paralyzed Veterans*, which does not subject every change in interpretive rules to the notice and comment process; rather, only those changes that are substantively different from long-standing interpretation with significant effect on the rights or duties of regulated entities may be found procedurally defective if adopted without a notice and comment process. *Paralyzed Veterans*, 117 F.3d at 588. At the same time, the D.C. Circuit has repeatedly recognized "that it is quite difficult to distinguish between substantive and interpretative rules." *Syncor Int'l Corp. v. Shalala*, 127 F.3d 90, 93 (D.C. Cir. 1997); *see also Air Transp. Ass'n of Am. v. FAA*, 291 F.3d 49, 55 (D.C. Cir. 2002) ("The distinction between a substantive rule and an interpretive rule can be less than clear-cut."). Thus, even if the plaintiff were correct about the Third Circuit's agreement with the rationale of *Paralyzed Veterans*, it does not necessarily follow that had *SBC, Inc. v. FCC* been in effect, the *Canonsburg I* court would have been any more persuaded that *Paralyzed Veterans* dictated a different result than the one reached, nor that the Third Circuit would have reached a different conclusion from the district court had the plaintiff appealed *Canonsburg I.*

---

2009) (contrasting the fact that the Fifth Circuit had "adopted" the *Paralyzed Veterans* doctrine with the Third Circuit having merely "mentioned [the doctrine] in dicta") (citing *SBC, Inc.*, 414 F.3d at 498). The Tenth Circuit, on the other hand, in a similar survey, noted that the Third Circuit has adopted *Paralyzed Veterans*. *See United States v. Magnesium Corp. of Am.*, 616 F.3d 1129, 1139 (10th Cir. 2010) (citing *SBC, Inc.*, 414 F.3d at 498). It is unnecessary for this Court to opine on the Third Circuit's view of *Paralyzed Veterans*, however, since, even if the Third Circuit has adopted *Paralyzed Veterans*, this would not overcome the issue preclusion doctrine for the reasons set out in Part III.B.

Finally, *Paralyzed Veterans* predates *Canonsburg I* and, in fact, the *Canonsburg I* court had the benefit of hearing the plaintiff's argument that PRM § 2534.5 is procedurally invalid because the new rule amounted to a substantial change to a prior interpretation without notice and comment. *See* Def.'s Mem. Ex. 4 (Pl.'s Brief In Support Of Motion For Summary Judgment in *Canonsburg I*), at 20–21, ECF No. 28-4 (arguing PRM § 2534.5 is procedurally invalid under *Paralyzed Veterans* and its progeny). The *Canonsburg I* court simply did not find the argument persuasive. *See Canonsburg I*, 2001 WL 36339671, at *4 (noting that the *St. Francis* court "found that PRM § 2534.5 was an interpretative rule not requiring notice and comment rulemaking.").

The plaintiff's argument that the *Canonsburg I* court "did not have the benefit" of *SBC, Inc.* boils down to the proposition that had *Paralyzed Veterans* been followed in that prior decision, the result would have been different. This is speculative at best. Indeed, in *St. Francis*, which the *Canonsburg I* court followed, the Sixth Circuit specifically addressed the argument that "PRM § 2534.5 is procedurally invalid because it is a substantive rule, yet it was not passed pursuant to the notice and comment requirements of the Administrative Procedure Act." The Sixth Circuit found that the PRM rule was interpretive rather than substantive since it "does not effect new substantive reimbursement standards inconsistent with prior regulations" and, therefore, concluded that "the Secretary was not required to comply with the APA's notice and comment procedures in issuing PRM § 2534.5." *Id*. at 947. The two district court decisions from this Circuit reached a different conclusion about the new and substantive nature of the PRM rule in holding it invalid. *See Montefiore Med. Ctr. v. Leavitt*, 578 F. Supp. 2d 129, 134 (D.D.C. 2008) ("PRM § 2534.5 . . . significantly alters an established agency interpretation [and] notice and comment procedures must be followed"); *Mercy Med. Skilled Nursing Facility v. Thompson*,

Nos. 99-2765, 01-2014 & 02-2252, 2004 WL 3541332, at *3 (D.D.C. May 14, 2004) (finding PRM § 2534.5 departed from a prior practice, the "length and consistency" of which was "sufficient to establish a definitive agency interpretation" for the purposes of *Paralyzed Veterans*).  That merely confirms, however, the D.C. Circuit's observation about the difficulty of distinguishing substantive and interpretive rules rather than showing that the *Canonsburg I* court would have reached a different conclusion under the Third Circuit's decision in *SBC, Inc.*

To bolster its argument that a changed legal landscape would make application of claim preclusion inappropriate here the plaintiff cites four cases, without any discussion of their underlying facts.  All of those cases are readily distinguishable and thereby actually undercut the plaintiff's position.  For example, *American Medical International, Inc. v. Secretary of Health, Education, and Welfare,* 677 F.2d 118 (D.C. Cir. 1981) ("*AMI*"), is a *per curiam* opinion involving the offensive use of collateral estoppel against the federal government in a Medicare reimbursement case.  *See* 677 F.2d at 119; Pl.'s Mem. at 20.  In *AMI*, the plaintiffs argued that the government was barred from asserting a legal argument in this Circuit since the same argument had been denied previously by another circuit court.  *AMI*, 677 F.2d at 119.  The D.C. Circuit found the offensive use of collateral estoppel against the government to be troubling since "agency relitigation of legal issues with substantial policy implications" is "healthy."  *Id.* at 122.  Moreover, the court also raised concerns about the mutuality of the parties in the prior litigation since the prior plaintiffs had been different subsidiaries, noting that the use of issue preclusion in that case would leave some subsidiaries of a company in a more-favored position than other subsidiaries of the same company, and, therefore, issue preclusion was inappropriate. *Id.* at 124.

Here, in contrast to *AMI*, the government is using collateral estoppel *defensively* against a plaintiff that has already tried the same legal issues before a federal court. The Supreme Court has acknowledged that "the Government is not in a position identical to that of a private litigant." *United States v. Mendoza*, 464 U.S. 154, 159 (1984) (quoting *INS v. Hibi*, 414 U.S. 5, 8 (1973) (*per curiam*)). The concern in *AMI* was not that an unfavorable decision against a private entity would put that entity at a disadvantage; it was that a favorable decision for an entity would unfairly advantage that entity *vis a vis* its peers. *See AMI*, 677 F.2d at 124 ("It patently would be unfair to apply one rule for AMI and AMI-Chanco (the subsidiaries) and another for the other subsidiaries."). The D.C. Circuit acknowledged that "[i]f the Government is litigating with the same adversary in both cases, an estoppel will petrify the law only as to that one party" but stated this is "obviously not an unjust result—and accordingly will work no preclusion generating national shockwaves." *Id.* Thus, in the instant case, where the government and the private entity are litigating the same issue, application of the issue preclusion doctrine is appropriate without running the risk of "petrifying the law" because other regulated entities not a party to *Canonsburg I* are still free to litigate this issue.

The plaintiff's citation to *Pharmaceutical Care Management Association v. District of Columbia*, 522 F.3d 443 (D.C. Cir. 2008) ("*PCMA*"), fares no better. Pl.'s Mem. at 18. *PCMA* involved the potential conflict between a District of Columbia law, which required pharmacists to make certain financial disclosures, and ERISA regulations that possibly preempted the D.C. statute. *Id.* at 445-46. The D.C. Circuit reversed the district court's finding that the plaintiff was precluded from challenging the D.C. law based on a First Circuit decision upholding a similar state law against the same plaintiff's challenge on identical grounds. *Id.* at 447.[9]

---

[9] The D.C. Circuit acknowledged that the district court reached this conclusion following a remand of the case for "the district court to consider the preclusive effect of the First Circuit's opinion." *PMCA*, 522 F.3d at 446.

*PMCA* is distinguishable on a number of grounds.  In that case, the district court applied non-mutual collateral estoppel using a case involving the same plaintiff but different defendants, interpreting a different law, in different circuits.  *Id.* at 446.  The district court had held that because the First Circuit rejected the plaintiff's arguments against a Maine law, and the District of Columbia had amended its law to conform to the Maine law, the plaintiff should be precluded from raising its constitutional challenge again in the District of Columbia.  *Id.*  The D.C. Circuit reversed, finding that application of collateral estoppel was not appropriate for several reasons, including that since the case involved non-mutual estoppel, "treating [the issue] as conclusively determined would inappropriately foreclose opportunities for obtaining reconsideration of the legal rule upon which it was based" and "prevent the court from performing its function of developing the law."  *Id.* at 446-47 (internal citation and quotation marks omitted).  This concern about "freez[ing] the development of the law in an area of substantial public interest," *id.*, which animated the decision in *PMCA*, is simply inapplicable here since the instant case does not involve non-mutual estoppel but identical parties to the parties in *Canonsburg I*.

Next, the plaintiff cites *Graphic Communications International Union v. Salem-Gravure Division of World Color Press, Inc.*, 843 F.2d 1490 (D.C. Cir. 1988) ("*Graphic Comm.*"), for the proposition that "issue preclusion does not apply when there has been an intervening change in legal principles."  Pl.'s Mem. at 18.  While the plaintiff is correct that *Graphic Comm.* contains language to that effect, the intervening legal change the D.C. Circuit was concerned with in *Graphic Comm.* was an express overruling of the Occupational Safety and Health Review Commission decision upon which the earlier case offered for preclusion purposes was based. *Graphic Comm.*, 843 F.2d at 1493.  At issue in *Graphic Comm.* was not a mere disagreement between district courts in different circuits, but rather an express overruling of the decision upon

which one party attempted to preclude the other.  *Id.*  It is not surprising that, in such a factual

scenario, the D.C. Circuit found the application of issue preclusion to be "unfair."

Finally, the plaintiff cites *Commissioner of Internal Revenue v. Sunnen*, 333 U.S. 591

(1948), in which the Supreme Court held, similarly to *AMI*, that a taxpayer should not be able to

benefit from one favorable tax ruling through the use of collateral estoppel when the underlying

legal framework changes in the interim.  *See id.* at 599; Pl.'s Mem. at 20.  The Court observed

that collateral estoppel "is not meant to create vested rights in decisions that have become

obsolete or erroneous with time, thereby causing inequities among taxpayers."  *Sunnen*, 333 U.S.

at 599.  In describing the type of legal change necessary to render the application of issue

preclusion unfair, the Court noted that "a judicial declaration intervening between the two

proceedings may so change the legal atmosphere as to render the rule of collateral estoppel

inapplicable," *id.* at 600, and pointed out that the legal changes "render[ing] inapplicable"

collateral estoppel in the *Sunnen* case included statutory, regulatory, and controlling Supreme

Court caselaw, *see id.* at 600–03 (pointing out changes to "the pertinent statutory provisions or

Treasury regulations," as well as six Supreme Court cases changing the rules for the particular

tax liability at issue.[10]

The instant case is quite different from *Sunnen*.  Here, the question at issue, regarding the

validity of PRM § 2534.5, has not been the subject of a ruling by any authority binding on this

_____

[10] The Supreme Court in *Sunnen* noted that "if the relevant facts in the two cases are separable, even though they be similar or identical, collateral estoppel does not govern the legal issues which recur in the second case."  *Sunnen*, 333 U.S. at 601 (referring to the difference in tax years in the case at issue).  The D.C. Circuit has recognized, however, that this portion of *Sunnen* is no longer good law.  *See AMI*, 677 F.2d at 120 ("[t]he [separable-facts] aspect of *Sunnen* is no longer good law.").  Thus, the fact that the plaintiff raises claims for a different year than those at issue in *Canonsburg I* does not bar application of claim preclusion.  *See Allen*, 449 U.S. at 94 (citing *Montana*, 440 U.S. at 153) ("once a court has decided an issue of fact or law necessary to its judgment, that decision may preclude relitigation of the issue in a suit on a different cause of action involving a party to the first case."); *Bodman*, 449 F.3d at 1257-58 ("When an issue of fact or law is actually litigated and determined by a valid and final judgment, and the determination is essential to the judgment, the determination is conclusive in a subsequent action between the parties, whether on the same or a different claim.") (internal quotations, citations and brackets omitted).

23

Court.  Unlike in *Sunnen*, a consensus appears elusive regarding the validity of PRM § 2534.5, in view of at least three cases, including one circuit court, finding the regulation to be invalid[11] and at least four other cases, including a different circuit court, finding the opposite.[12]  Thus, continued application of the challenged rule does not work a substantial unfairness.

In sum, no consensus has been reached among the circuits about the validity of PRM § 2534.5, *Canonsburg I* has not been overruled in the Third Circuit, and there is no binding authority on point in this Circuit.  Accordingly, the plaintiff has not shown a critical change in controlling law such that the current legal landscape would make application of the issue preclusion doctrine to the plaintiff unfair.

### C. Plaintiff's Second Argument That The Defendant Waived The Application Of Issue Preclusion In Administrative Proceeding Below

The plaintiff argues that because the defendant did not raise the collateral estoppel issue in the administrative proceedings below, it has waived the affirmative defense now.  This argument is unavailing.

The primary case on which the plaintiff bases its waiver argument, and the only binding authority the plaintiff cites, is *Poulin v. Bowen*, 817 F.2d 865 (D.C. Cir. 1987).  In *Poulin*, the D.C. Circuit found that the Social Security Administrator had waived any res judicata defense because the claims administrator examined the merits of the claim for the benefits at issue even after recognizing that the claim had been previously administratively rejected.  *See id.* at 868–69.  The D.C. Circuit pointed to the express statutory authorization for the invocation of

---

[11] *See St. Luke's Methodist Hosp. v. Thompson*, 315 F.3d 984, 989 (8th Cir. 2003) ("*St. Luke's*") (finding PRM § 2534.5 to be "unreasonable and arbitrary"); *Montefiore*, 578 F. Supp. 2d 129, 130 (D.D.C. 2008) (remanding to the HHS for failure to follow the APA's notice-and-comment procedures); *Mercy Med.*, 2004 WL 3541332, at *3 (same).

[12] *See Canonsburg I*; *St. Francis*, 205 F.3d at 944 (finding PRM § 2534.5 not arbitrary and capricious use of Secretary's power); *Ft. Bend Cmty. Hosp. v. Thompson*, No. H-00-4020, 2003 WL 25973213, at *8 (S.D. Tex. Aug. 26, 2003) (adopting magistrate decision in full finding regulation procedurally valid); *San Joaquin Cmty. Hosp.*, 2002 WL 34596496, at *12–14 (rejecting reasoning in *St. Luke's* as invalid and finding regulation reasonable).

administrative res judicata during administrative proceedings for Social Security disability benefits, *see* C.F.R. § 404.957(c)(1), and the fact that the agency defendant had not only failed to plead this defense in its answer but then raised it belatedly before the D.C. Circuit. *Poulin*, 817 F.2d at 869. In these circumstances the D.C. Circuit found the available res judicata defense was waived, stating "[t]he failure to plead res judicata, coupled with the express waiver at the administrative level, precludes its application now." *Id.*

*Poulin* is distinguishable from the instant case for three critical reasons. First, unlike the agency defendant in *Poulin,* the defendant in the instant case has consistently raised its collateral estoppel defense throughout these Court proceedings. *See, e.g.*, Answer at 1, ECF No. 10.

Second, unlike in *Poulin*, the prior decision, which the agency sought to give preclusive effect in court, was a *prior agency* decision. The defendant here seeks issue preclusion based upon a *prior judicial* decision. This point was significant in *Poulin*: the D.C. Circuit emphasized that the agency defendant had "expressly waived applicability of *administrative* res judicata" and thus "may not now advance this doctrine as an alternative basis for its decision." *Poulin*, 817 F. 2d at 869 (emphasis added). While the parties dispute whether the Secretary was in a position to raise the preclusion defense during the administrative proceedings before either the PRRB or as part of the CMS Administrator's decision, *see* Def.'s Reply at 14; Pl.'s Mem. at 4, the fact remains that no administrative decision is being offered as the basis for issue preclusion.[13]

---

[13] In arguing that the defendant agency should be penalized for not raising issue preclusion during the administrative proceedings, the plaintiff notes the "excellent policy reason to require the Secretary to assert preclusion defenses during PRRB proceedings" because "[o]therwise, the administrative adjudicatory resources of the PRRB will be wasted if the case is fully tried and then an affirmative defense is raised only on appeal." Pl.'s Reply at 4 n.6. While the plaintiff's paean to preclusion defenses is somewhat ironic, it is generally understood that "preclusion principles are to be applied more flexibly to administrative adjudications than to judicial proceedings" because "administrative proceedings vary much more widely than judicial proceedings." *See Clark-Cowlitz Joint Operating Agency v. FERC*, 826 F.2d 1074, 1080 n.5 (D.C. Cir. 1987). Indeed, rather than a rigid adherence to prior decisions, policy interests may be better served by agencies ensuring the highest quality of its decisions, which may require reexamination of prior decisions in light of potentially changed factual or policy circumstances. *See Ramaprakash v. FAA*, 346 F.3d 1121, 1124 (D.C. Cir. 2003) ("Agencies are free to change course as their expertise and experience

Rather, unlike in *Poulin*, the focus here is on the preclusive effect of a judicial decision made by a court with subject matter jurisdiction to consider the validity of the challenged PRM rule under the APA.

Finally, related to the second point, "while res judicata exists in part to shield parties from duplicative and vexatious litigation," this doctrine also protects the interests of the courts. *Stanton v. District of Columbia Court of Appeals*, 127 F.3d 72, 77 (D.C. Cir. 1997). Thus, "res judicata belongs to courts as well as to litigants, [and] even a party's forfeiture of the right to assert it" does not "destroy a *court's* ability to consider the issue sua sponte." *Id.* (emphasis in original); *see also Plaut v. Spendthrift Farm, Inc.*, 514 U.S. 211, 231 (1995) (noting that while "waivers of res judicata [by litigants] are [not] always impermissible, . . . waivers of res judicata need not always be accepted"); *Commodity Futures Trading Comm'n v. Schor*, 478 U.S. 833, 851 (1986) (stating that when "Article III limitations are at issue, notions of consent and waiver [by parties] cannot be dispositive because the limitations serve institutional interests that the parties cannot be expected to protect."). Consequently, even if no preclusion defense were raised during the administrative proceedings—and the Secretary was deemed to have waived such defense—the Court could nonetheless take notice of the prior judicial decision in *Canonsburg I* to assess its preclusive effect here. In short, the Court rejects the plaintiff's contention, in reliance on *Poulin,* that to invoke issue preclusion arising from a prior judicial decision, an agency must satisfy "dual requirements that the defense be asserted first at the administrative level and, subsequently, in court." Pl.'s Reply at 3.[14]

---

may suggest or require, but when they do so they must provide a reasoned analysis indicating that prior policies and standards are being deliberately changed, not casually ignored.") (internal quotation marks omitted).

[14] The plaintiff also cites *Morris v. Sullivan*, 897 F.2d 553, 557 n.8 (D.C. Cir. 1990), as support for its "dual requirements" position because, in that case, "there had been no waiver of the *res judicata* affirmative defense at the administrative level by the agency." Pl.'s Reply at 2. The plaintiff misconstrues *Morris* as showing "that raising the affirmative defense in court pleadings alone" is not sufficient. *Id.* In *Morris*, the agency denied the plaintiff's request to reopen the plaintiff's previously rejected claim for lack of new evidence, and the D.C. Circuit concluded

The other cases on which the plaintiff relies are neither binding on this Court nor particularly relevant. For instance, the plaintiff cites dictum in a footnote in *Municipal Resale Service Customers v. FERC*, 43 F.3d 1046, 1052 n.4 (6th Cir. 1995) ("*MRSC*"), see Pl.'s Mem. at 15, where the court noted that it was possible to waive res judicata and collateral estoppel defenses by failing to raise the defenses during administrative proceedings, but found it unnecessary to reach the question because such defenses would have been fruitless in that case due to the addition of new plaintiffs. Similarly, in *Andrews v. D.C. Police and Firefighters Retirement & Relief Board*, 991 A.2d 763, 767 (D.C. 2010), the question of res judicata was raised before the District of Columbia Court of Appeals *sua sponte* at oral argument and neither side sought to invoke the doctrine, which is a far different posture than presented in this case. *See* Pl.'s Mem. at 15.

The Court finds that the defendant has timely asserted the affirmative defense of issue preclusion in this case and has not waived this defense. Thus, the plaintiff's argument that it is unfair to consider this defense when it was not raised during administrative proceedings is unpersuasive.

### D. The Plaintiff's Third Argument That *Chenery* Bars Issue Preclusion

The plaintiff's further argues that because the defendant did not use issue preclusion based upon *Canonsburg I* to dispose of the case during administrative proceedings, the Court is barred by the doctrine set out in *SEC v. Chenery*, 332 U.S. 194, 196 (1947), from considering this defense now as it "is beyond the proper scope of review." *See* Pl.'s Mem. at 17–18. The plaintiff misconstrues this doctrine, which is inapplicable here.

---

that it had no jurisdiction to hear the claim under the applicable statute, 42 U.S.C. § 405, which permits judicial review only after a hearing. *See Morris*, 897 F.2d at 557–59. The *Morris* court simply did not address whether a res judicata defense had to be raised at the administrative proceeding stage in order for consideration of the defense in a subsequent judicial proceeding; rather the focus of the court's analysis was whether consideration of the merits of a petition to reopen was sufficient to permit judicial review under the applicable statute.

As the defendant correctly states, the *Chenery* doctrine requires courts "in dealing with a determination or judgment which an administrative agency alone is authorized to make" to "judge the propriety of [agency] action solely by the grounds invoked by the agency." *SEC v. Chenery*, 332 U.S. at 196. Application of issue preclusion based upon a prior judicial decision is not "a determination or judgment which an administrative agency alone is authorized to make." Rather, issue preclusion in these circumstances is a distinctly legal doctrine that is primarily concerned with "orderliness and reasonable time saving in judicial administration." *Blonder-Tongue Labs., Inc.*, 402 U.S. at 324. Indeed, even if the defendant agency had raised, considered and rejected the preclusive effect of the prior judicial decision in *Canonsburg I*, as the plaintiff contends it must to raise this defense here, the agency's legal conclusion would not be binding on this Court.[15] *Accord Univ. of Tenn. v. Elliott*, 478 U.S. 788, 798 (1986) (finding that "giving preclusive effect to administrative factfinding serves the value underlying general principles of collateral estoppel: enforcing repose," but not addressing the preclusive effect of administrative legal conclusions); *see also Peery v. Brakke*, 826 F.2d 740, 746 (8th Cir. 1987) ("*Elliot* directs that a state agency's *factfinding* is to be given preclusive effect in a subsequent § 1983 action" but where the disputed issue is one of law "issue preclusion under *Elliot* does not apply in any meaningful sense"); *Perley by Perley v. Palmer*, 157 F.R.D. 452, 457 (N.D. Iowa 1994) (holding that no preclusive effect need be given "to the legal conclusions of an administrative agency"

---

[15] Notably, both of the legal questions posed in the instant case, namely, the threshold question of whether to give preclusive effect to *Canonsburg I*, and the merits question of whether the challenged PRM rule is valid under the APA, fall squarely within the expertise of Article III courts rather than agency administrators. This fact would militate against giving preclusive effect to an agency decision on either question, even if issue preclusion had been raised during the administrative proceedings and resolved against the plaintiff. *See Barlow v. Collins*, 397 U.S. 159, 166 (1970)("The rule of the courts should, in particular, be viewed hospitably where . . . the question sought to be reviewed does not significantly engage the agency's expertise.") (quoting *Hardin* v. *Ky. Utils. Co*., 390 U.S. 1, 14 (Harlan, J., dissenting); *Athlone Indus., Inc. v. Consumer Prod. Safety Comm'n*, 707 F.2d 1485, 1489 (D.C. Cir. 1983) (holding that administrative exhaustion was not required where issue was strictly legal, "[n]o factual development or application of agency expertise [would] aid the court's decision," a decision by the court would not "invade the field of agency expertise or discretion," and controversy "presents issues on which courts and not administrators are more expert" when the only dispute relates to the meaning of a statutory term).

when "this issue involves the interpretation of the applicable Medicaid statute and accompanying regulations, and therefore is clearly a question of law and not one of fact.")); *cf. Sea-Land Serv., Inc. v. U.S. Dep't of Trans.*, 137 F.3d 640, 649 (D.C. Cir. 1998) (leaving open question as to whether administrative determination on question of law had any preclusive effect on later judicial adjudication).

The plaintiff relies, with only brief discussion, on several cases to urge this Court to apply the *Chenery* doctrine and bar the preclusion defense "where the agency had not invoked the defense as part of its decision under review." Pl.'s Reply at 8; *see also* Pl.'s Mem. at 17. Two of the cases, *Riffin v. Surface Transportation Board*, 592 F.3d 195, 198 (D.C. Cir. 2010) and *Manin v. National Transportation Safety Board*, 627 F.3d 1239, 1243 (D.C. Cir. 2011*)*, are wholly inapposite since the court in those cases addressed the sufficiency under the APA of the federal agency's explanation for the challenged decision, and not whether the agency had waived an otherwise available preclusion defense. *See Riffin,* 592 F.3d at 198 (D.C. Cir. 2010) (finding agency counsel's *post hoc* factual justification for agency action rendered challenged decision arbitrary and capricious requiring remand for further proceedings); *Manin*, 627 F.3d at 1243 (D.C. Cir. 2011) (finding agency's *post hoc* justification for its departure from precedent without offering any explanation for this departure during administrative proceedings rendered the challenged decision arbitrary and capricious and required remand).

Likewise, the plaintiff's reliance on *United States Postal Service v. NLRB*, 969 F.2d 1064 (D.C. Cir. 1992), is misplaced. *See* Pl.'s Reply at 8. There, the union intervening in the case sought to preclude the Postal Service from asserting a claim that it had previously lost but not appealed in another NLRB proceeding, arguing that "the Service, having deliberately passed up its first opportunity, should not be accorded a second chance for court review." *Id*. at 1069. The

D.C. Circuit declined to consider issue preclusion, however, because the defendant agency did not raise it and "courts do not force preclusion pleas on parties who choose not to make them." *Id.* By contrast, here, the agency is actually raising the issue preclusion defense, which is based upon a prior judicial, not prior administrative, decision.[16]

The *Chenery* doctrine is inapplicable to the instant case because the issue under review does not involve a determination that the agency alone was authorized to make. Therefore, because this argument has no basis in the law, its rejection cannot work a fundamental unfairness on the plaintiff.

### E. The Plaintiff's Fourth Argument Regarding Policy Considerations

Finally, the plaintiff presses the argument that the policy considerations underlying the collateral estoppel doctrine would be undercut by its application here. *See* Pl.'s Mem. at 20–22. In making this argument, the plaintiff puts forth three rationales, none of which are persuasive.

First, the plaintiff argues that that the "the parties have already fully tried the merits of Canonsburg Hospital's cases before the PRRB and the CMS Administrator," and, therefore, "[d]eciding this case based on collateral estoppel cannot undo that reality." Pl.'s Mem. at 20. This argument is a non-sequitur. The conservation of judicial resources policy underpinning

---

[16] The plaintiff also cites a footnote in *MRSC*, 43 F.3d at 1052 n. 4. In that case, the intervenor Ohio Power sought to bar the plaintiffs under res judicata and collateral estoppel from relitigating issues decided against them in another case. *Id.* The Sixth Circuit declined in the footnote to impose the requested procedural bar because Ohio Power had not raised the estoppel issue during administrative proceedings and, in any event, the case involved new plaintiffs not bound by the original decision on which preclusion would be based. *See id.* Although the court in *MRSC* predicates its waiver conclusion on the intervenor's apparent failure to raise the collateral estoppel issue in the proceedings below, this appears contradicted by the court's recognition that the intervenor, in the underlying administrative proceeding, "moved to dismiss the complaint, arguing that the D.C. Circuit's decision precluded the relief sought by the MRSC." *Id.* at 1050. The internally inconsistent factual predicate for the court's footnote makes its conclusion regarding waiver questionable. In any event, this Sixth Circuit case is not binding on this Court and, unlike the instant case, rested at least in part on the lack of identity of parties. Additionally, the sparse consideration of the issue makes this footnote unpersuasive, particularly given what the court itself described as the "unusual situation" and the complex procedural posture of *MRSC, see id.* at 1052, and in light of this Circuit's binding precedent in *United States Postal Service*, stating intervenors (as Ohio Power was in *MRSC*) cannot assert a preclusion defense on behalf of a defendant that chooses not to do so. *See United States Postal Service*, 969 F.2d at 1069.

issue preclusion relates to tying up more than one district court judge in resolving the merits of the same legal issue. Having this Court review the merits of the same legal issue considered in *Canonsburg I* between the identical parties is the type of duplicative expenditure of judicial resources that the preclusion doctrine is intended to bar, regardless of the administrative resources expended in adjudicating the underlying dispute.

Second, the plaintiff accuses the defendant of using "gamesmanship" to "prevent[] development of the law in the D.C. Circuit on the precise issues in this case." Pl.'s Mem. at 20. Specifically, the plaintiff suggests that the defendant's litigation strategy in other, unrelated cases, where the defendant has chosen to settle with plaintiffs rather than pressing an appeal, results in providers being "forced to file lawsuits appealing these same issues, rather than having the issues efficiently resolved by the cases that were already pending in this Circuit." *Id.* at 20–21. While the Court appreciates the plaintiff's frustration with the lack of a definitive answer on the issue and "ongoing litigation in the D.C. Circuit over [the defendant's] gap methodology," Pl.'s Mem. at 21, these are not considerations relevant to the application of issue preclusion. In short, the fact that the defendant has entered into settlement agreements is simply irrelevant to whether issue preclusion is appropriately applied here. The plaintiff ignores the well-recognized public interest in the voluntary settlement of legal actions. *See, e.g.*, *Citizens for a Better Env't v. Gorsuch*, 718 F.2d 1117, 1126 (D.C. Cir. 1983) ("Not only the parties, but the general public as well, benefit from the saving of time and money that results from the voluntary settlement of litigation."); *see also* L.Cv.R. 16.3(c)(5) (requiring parties to consider whether disputes can be resolved through participation in court sponsored mediation or other alternative dispute resolution before proceeding to trial). The fact that the defendant has chosen to settle cases involving similar legal issues to those litigated in the instant case and *Canonsburg I* has no

bearing on whether the application of issue preclusion here creates a fundamental unfairness for the plaintiff.[17]

Finally, the plaintiff urges that deciding this case on the merits would not create "any additional risk of inconsistent court decisions." Pl.'s Mem. at 21–22. In support of this assertion, the plaintiff states that "the decisions of both the PRRB and the courts have uniformly swung against the Secretary in favor of providers." Pl.'s Mem. at 22. Implicit in this argument is the apparent presumption that if this case were allowed to proceed on the merits "[a] decision in favor of [the plaintiff] on this appeal" would follow. Pl.'s Mem. at 22. While this Court is not reaching the merits, it is not at all so clear that the plaintiff would prevail. Courts have plainly reached different conclusions regarding the validity of PRM § 2534.5 under the APA. In any event, even if the plaintiff's apparent presumption were correct, the plaintiff offers no rationale for why this chance at being heard on the merits again is any different than the chance of any other precluded party who has once had its day in court. Therefore, the plaintiff's policy rationales make an insufficient showing that it would be fundamentally unfair to apply issue preclusion to the instant case.[18]

*　　*　　*

Once a party has had its day in court, with every incentive to litigate its case fully, a compelling showing of unfairness is necessary to avoid the application of issue preclusion to any subsequent suit between the same parties addressing the same legal issues. *See Otherson*, 711 F.2d at 277. The Court finds that, because the parties and issues are identical to those in

---

[17] The Court also notes that the plaintiff chose not to appeal its case in the Third Circuit following *Canonsburg I*, which similarly would have "definitively resolved these issues."

[18] In a last gasp effort to avoid the application of issue preclusion to this case, the plaintiff argues that it "would have sought discovery concerning how the Secretary has treated claims for exception relief since the Eighth Circuit's decision in *St. Luke's*." Pl.'s Mem. at 17. Considering that the application of issue preclusion is solely a matter of law, it is unclear how discovery would have any relevance to this doctrine's application here.

*Canonsburg I*, that the plaintiff had a full and fair opportunity to litigate with adequate incentives to do so, and the application of issue preclusion would not inflict a fundamental unfairness on the plaintiff, the plaintiff is estopped from raising again the issues resolved in *Canonsburg I*.

## IV.  CONCLUSION

For the aforementioned reasons, the Court finds that the relitigation of the issues raised by the plaintiff is precluded by the decision in *Canonsburg I*.  Therefore, the defendant's Motion for Summary Judgment is GRANTED and the plaintiff's Cross-Motion for Summary Judgment is DENIED.

An appropriate Order accompanies this Memorandum Opinion.

Date:  October 17, 2013

_____
BERYL A. HOWELL
United States District Judge